## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TEXAS TREASURY SAFEKEEPING TRUST COMPANY | ) ) ) | |
| *Plaintiff,* | ) ) | Case No.: 21-cv-6074 |
| v. | ) ) | **COMPLAINT** |
| ALLIANZ GLOBAL INVESTORS US LLC, ALLIANZ GLOBAL INVESTORS U.S. HOLDINGS LLC, ALLIANZ SE, ALLIANZ ASSET MANAGEMENT GMBH, ALLIANZ OF AMERICA, INC., ALLIANZ ASSET MANAGEMENT OF AMERICA HOLDINGS INC., ALLIANZ ASSET MANAGEMENT OF AMERICA LLC, ALLIANZ ASSET MANAGEMENT OF AMERICA LP, AND PFP HOLDINGS INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiff, the Texas Treasury Safekeeping Trust Company ("Texas Trust"), by and through its undersigned counsel, respectfully submits its Complaint against Defendants Allianz Global Investors US LLC ("AllianzGI"), Allianz Global Investors U.S. Holdings LLC, Allianz Asset Management of America LP, Allianz Asset Management of America LLC, PFP Holdings Inc., Allianz Asset Management of America Holdings Inc., Allianz of America, Inc., Allianz Asset Management GmbH, and Allianz SE (together, "Defendants" or "Allianz"), as follows:

## NATURE OF THE ACTION

1.     This is an action by the Texas Trust against Defendants for negligence, breach of fiduciary duty, and breach of contract, arising from AllianzGI's gross mismanagement of the Texas Trust's investments in the AllianzGI Structured Alpha Global Equity 350 Fund ("Alpha 350 Fund") and AllianzGI Structured Alpha 1000 Fund ("Alpha 1000 Fund") (together "Alpha Funds").

2.     In violation of its contractual and fiduciary duties, AllianzGI abandoned its stated investment mandates (*e.g.*, "**Buy put options—in a greater quantity than sold— to protect the portfolio in the event of a market crash/closure**") when such positions were most needed to protect against increasing market volatility. Indeed, rather than protect against a market crash, AllianzGI positioned the Alpha Funds' portfolios in a manner contrary to its investment mandate, all but guaranteeing substantial losses once that downturn came to pass. Defendants' negligent and wrongful actions resulted in massive losses for the Texas Trust, wiping out more than 120 million dollars of Texas Trust's assets in a matter of weeks.

3.     Defendants' wrongful conduct, as detailed above and below, left the Alpha Funds dangerously exposed to even the slightest increase in market volatility or further decline in equity prices—the very conditions Allianz economists, and many others, warned were on the immediate horizon.

4.     AllianzGI did not simply make a bad judgment in the midst of a market disruption. Instead, it jettisoned substantial parts of the investment strategy, including

the tail risk protection strategy, which had been repeatedly touted by AllianzGI and memorialized in contracts with Plaintiff, and which had been designed to protect the Alpha Funds' investors against the very market conditions experienced in February and March 2020.

5.      The Alpha Funds were supposed to generate returns in times of rising or falling equity markets and during both low and high market volatility. As AllianzGI stated in the Alpha Funds' marketing materials, referred to in the agreements between the Texas Trust and AllianzGI, the Allianz Structured Alpha strategy "seeks to achieve a consistent return stream that has low correlation with the movement of equity or fixed income markets." The Allianz Structured Alpha strategy also purported to "[b]uy put options — in a greater quantity than sold — to protect the portfolio in the event of a market crash/closure. The puts are laddered for various market outcomes to the downside" and "are designed for tail risk protection, not for outperformance potential, but are a key feature of the strategy's risk management." Further, the marketing materials state that the Allianz Structured Alpha strategy has the "[a]bility to perform irrespective of the market environment" and was "[d]esigned to generate returns in normal up, down, or flat markets."

6.      The Alpha Funds purportedly would "protect against a **market crash**." A "key feature of the strategy's risk management" was downside risk protections "designed for tail risk protection, not for outperformance potential." In establishing these positions, Allianz was supposed to buy put options in a greater quantity than it sold to

"protect the portfolio in the event of a market crash" and which were to be "laddered for various market outcomes to the downside," ensuring protection in a wide range of negative scenarios.

7.    The Alpha Funds' investment mandate required active portfolio management and close monitoring by Defendants, not just the manager AllianzGI, to ensure protection against a market crash and to be both short and long volatility as market conditions changed—a portfolio construction that required stringent risk management policies and protocols to ensure that the strategy worked as represented by the contracts and related materials. The investment strategy mandated that AllianzGI perform tail-risk protection, risk reduction, and/or volatility smoothing based on analysis of historical movements of broad-based US indices, as well as rigorous scenario and stress testing of the portfolio under the very kinds of market conditions that occurred in February and March 2020.

8.    To benefit from the investment strategy presented by Defendants, in late July 2014, Plaintiff invested $40 million in the Structured Alpha 1000 Fund. Later, in late January 2015, Plaintiff invested an additional $10 million in the Structured Alpha 1000 Fund. Then, in late April 2015, Plaintiff invested another $10 million in the Structured Alpha 1000 Fund. A few months later, in August 2015, Plaintiff further invested $10 million in the Structured Alpha 1000 Fund. In February 2018, Plaintiff made its initial investment of $30 million in the Structured Alpha 350 Fund.

9.     In late February 2020, global markets began to experience volatility as COVID-19 spread beyond China. At the same time, as investor concerns over the impact of the coronavirus began reverberating through the markets, AllianzGI positioned the Alpha Funds as "short" volatility—meaning that the Alpha Funds would suffer losses if market volatility continued to increase, thereby exposing the Alpha Funds to catastrophic losses in the event of a market downturn.

10.     The increase in the premiums associated with selling protection against volatility allowed AllianzGI to sell options to other investors at increased premiums, perhaps in an attempt to "recoup" losses suffered by the Alpha Funds in early February 2020. But this new strategy conflicted with the Alpha Funds' stated mandate, and AllianzGI's duty to Plaintiff, to maintain downside protection sufficient to withstand a market crash. Specifically, with volatility at record highs, AllianzGI made a risky attempt to profit by selling far more volatility protection than it purchased. These positions would only generate positive results if volatility decreased. This strategy, absent proportional protective strategies and undertaken with Plaintiff's assets, appears to have been premised on the faulty assumption that volatility would decrease.

11.     As the pandemic raged in March 2020, market volatility surged. And as Allianz economists predicted, investor uncertainty concerning the economic impact of the coronavirus triggered sharp declines in equity prices and prompted substantial market volatility. The Alpha Funds suffered catastrophic losses because AllianzGI sold the volatility protection to other investors without sufficiently offsetting downside

protection. While Defendants were obligated to have positions in place to protect against losses in the event of a severe market downturn, in reality, the hedges AllianzGI executed were not hedges at all, but instead materially increased the risk to Plaintiff. Worst of all, the improper market bets made by AllianzGI locked in the losses, exacerbating a problem that was already spiraling out of control.

12.     Despite AllianzGI's supposedly robust risk management practices, Defendants simply did not carry out the mandated downside protection strategy, which had a catastrophic impact on Plaintiff's assets in the Alpha Funds due to Defendants' negligence, mismanagement, and failure to monitor AllianzGI.

13.     On March 25, 2020, AllianzGI announced that it was liquidating the Alpha 1000 Fund and the Structured Alpha 1000 Plus because the losses in those Funds were insurmountable. Shortly thereafter, Plaintiff had no choice but to seek redemption for the remainder of its investments in the Alpha 350 Fund, locking in substantial losses.

14.     Plaintiff's Alpha 1000 Fund assets were reduced by at least 97%, and the Alpha 350 Fund assets by at least 60% primarily as a result of Defendants' wrongful conduct.

15.     As a result of Allianz's negligence and breaches of fiduciary duty and contract, Texas Trust suffered losses in excess of $123,000,000.

16.     Since the Alpha Funds' collapse, Defendants have falsely claimed in public statements that the losses were supposedly caused by the extent and speed of the March market decline. This explanation is at odds with the facts (and contrary to) the stated

investment mandates represented to Plaintiff at the time of investment. Not surprisingly, the SEC has opened an investigation into Defendants' actions in connection with the Alpha Funds' collapse.

## PARTIES

17.     Plaintiff Texas Trust is a special purpose trust company organized under the laws of the State of Texas. Plaintiff is headquartered in Austin, Texas, and has its principal place of business at 208 East 10th Street, Fourth Floor, Austin, Texas 78701. Texas Trust was created by the Texas Legislature as a special purpose entity to efficiently and economically manage, invest and safeguard funds for its clients, which are the state and its various subdivisions. The Texas Trust's mission is to preserve and grow the state's financial resources by competitively managing and investing them in a prudent, ethical, innovative, and cost-effective manner while focusing on client needs.

18.     Defendant Allianz Global Investors U.S. LLC is a registered investment advisor and a Delaware limited liability company with principal offices in New York, NY; Boston, MA; Dallas, TX; San Diego, CA; and San Francisco, CA. AllianzGI is a direct, wholly-owned subsidiary of Allianz Global Investors U.S. Holdings LLC. AllianzGI is the investment manager for the Alpha Funds.

19.     Defendant Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings") is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York. AllianzGI Holdings is the direct, 100% owner and sole member of AllianzGI.

7

20.     Defendant Allianz Asset Management of America L.P. ("AAMA LP") is a registered investment advisory firm and a Delaware limited partnership based in Newport Beach, CA. AAMA LP is the direct, 100% owner and sole member of AllianzGI Holdings.

21.     Defendant PFP Holdings Inc. ("PFP"), a limited partner of AAMA LP, is incorporated in Delaware and has its principal place of business in Newport Beach, California.

22.     Defendant Allianz Asset Management of America Holdings Inc. ("AAMA Holdings") is a Delaware corporation with its principal place of business in Newport Beach, California. AAMA Holdings holds a 0.1% managing interest in AAMA LLC.

23.     Defendants AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, PFP, AAMA LLC, and AAMA Holdings are part of what Defendants branded the "Allianz Global Investors"—Allianz Group's global asset management business.

24.     Defendant Allianz of America Inc. ("Allianz of America") is a Delaware corporation with its principal place of business in Novato, California. It holds a 99.8% non-managing interest in AAMA LLC. Allianz of America is a wholly-owned indirect subsidiary of Allianz SE.

25.     Defendant Allianz Asset Management GmbH ("AAM GmbH") is incorporated and headquartered in Munich, Germany, and is the asset management division of Allianz SE. AAM GmbH is the direct, 100% owner of AAMA Holdings and holds a 0.1% non-managing interest in AAMA LLC. In 2019, Allianz SE reported €7.164

billion in operating revenue from the Allianz Asset Management business organized under AAM GmbH, substantially including revenues derived from AAM GmbH's activities and interests in managing the Structured Alpha Funds through the operation of Allianz Global Investors, which AAM GmbH controlled at all relevant times. Given AAM GmbH's control and management of Allianz Global Investors, AAM GmbH was responsible for the sale, marketing, operation, and risk management of the Structured Alpha Funds sold to Plaintiff.

26.     Defendant Allianz SE is a publicly traded European insurance and financial services company based in Munich, Germany that provides asset management services to 82 million clients in over 70 countries. Allianz SE refers to itself and its subsidiaries as the "Allianz Group." Allianz SE holds a direct, nearly 75% interest in AMA GmbH and an indirect, 100% interest in Allianz of America. According to the Allianz SE Statutes, or articles of incorporation, Allianz SE's "corporate purpose" is "the direction of an internal group of companies, which is active in the areas of insurance, banking, asset management, and other financial, consulting, and similar services." Allianz SE, through its control over Allianz Global Investors, engaged in substantial management and business activities associated with the sale, distribution, supervision, and risk management of the Alpha Funds, as marketed and sold to Plaintiff.

27.     The personnel and operational overlap of the above Defendants establish the principal-agency relationship between each entity and AllianzGI, which is also evidenced by their shared ownership, shared directors and officers, and a unilateral

reporting structure. For example, AllianzGI's sole and direct corporate parent, AllianzGI Holdings, shares numerous overlapping directors and executives, as well as the same business address and phone number with AllianzGI. Specifically, Gemesh Pushpaharan is both the COO and Managing Director of AllianzGI and a member of the Executive Committee of AllianzGI Holdings. Paul Koo is both the Chief Compliance Officer of AllianzGI and a director of AllianzGI Holdings. As such, he executed AllianzGI's Forms 13G filed with the SEC on behalf of both AllianzGI and AllianzGI Holdings.

28.     Further, numerous individuals held director or managing director positions at both AllianzGI and AllianzGI Holdings: Barbara Claussen, John Carroll, David Jobson, Erin Bengtson Olivieri, Christopher Cieri, Joseph Quirk, Steven Ricci, Frank Garofalo, Bruce Goodman, David Hood, Douglas Forsyth, Peter Bonanno, and Joseph Scull.

29.     Further establishing the chain of control among these entities, AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, AAMA Holdings, and PFP, under current and prior entity names, have had shared directors and officers, including:

- John Maney: COO and Managing Director of AAMA LP and AAMA LLC, and Managing Director of AllianzGI.

- James Funaro: Senior Vice President of AllianzGI, AAMA LP, AAMA LLC, AAMA Holdings, and AllianzGI Holdings, and SVP of Tax Matters for PFP.

- Tony Burg: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and AllianzGI Holdings.

- Kellie Davidson: Secretary of AllianzGI, AAMA LLC and AAMA LP; Assistant Secretary of AAMA Holdings, AllianzGI Holdings.

- Tucker Fitzpatrick: Senior Vice President and Secretary of AAMA Holdings; Senior Vice President and General Counsel of AAMA LP, Assistant Secretary of AllianzGI Holdings and Allianz GI.

- Michael Puntoriero: CFO of AAMA Holdings, AllianzGI Holdings; Managing Director and CFO of AllianzGI, AAMA LLC, AAMA LP and PFP.

- Vinh Nguyen: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

- Colleen Martin: SVP and Controller of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

- John Viggiano: Managing Director and US General Counsel with Allianz Global Investors, who previously served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for AAM GmbH.

30.    The positions held by these individuals in various subsidiaries within Allianz Group, including AllianzGI, are summarized in the chart below:

|  | AllianzGI | AllianzGI Holdings | AAMA LP | AAMA LLC | AAMA Holdings | PFP Holdings | AAM GmbH |
|---|---|---|---|---|---|---|---|
| John Maney | X |  | X | X |  |  |  |
| James Funaro | X | X | X | X | X | X |  |
| Tony Burg | X | X | X | X | X |  |  |
| Kellie Davidson | X | X | X | X | X |  |  |
| Tucker Fitzpatrick | X | X | X |  | X |  |  |
| Michael Puntoriero | X | X | X | X | X | X |  |
| Vinh Nguyen | X |  | X | X | X | X |  |
| Colleen Martin | X |  | X | X | X | X |  |
| John Viggiano | X |  |  |  |  |  | X |

## JURISDICTION AND VENUE

31.    This Court has jurisdiction over the causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1332(a)(3) because the dispute is between a citizen of Texas and citizens of different U.S. states and of Germany, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

32.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and because the Parties agreed to adjudicate claims in this District. For example, Section 8.06 of the Second Amended and Restated Limited Liability Company Agreement ("LLC Agreement") provides that "the parties . . . consent and submit to the jurisdiction of the . . . U.S. District Court for the Southern District of New York."

## FACTUAL BACKGROUND

**I.    Plaintiff's Introductions to the Alpha Funds.**

33.    The Defendants' Structured Alpha Funds are founded upon a portfolio risk management overlay strategy that provides multiple layers of risk control to protect the Funds through sufficient tail risk protection against market shocks to the downside, including: real-time risk monitoring, historical scenario modeling, rigorous stress testing of the portfolio, and the analysis of statistically significant equity market scenarios; tail-risk hedging positions that are embedded in the portfolio at all times; and independent risk-oversight professionals who monitor trade activity and risk profiles daily. The overlay's risk-controlled strategy has been described by the Defendants' (Greg Tournant)

12

as being similar to an "insurance company using reinsurance to further protect the portfolio and business."

34.     As set forth above, the Defendants provided Plaintiff with various documents and marketing materials that discussed the investment in the Alpha Funds and highlighted the fact that an investment in the Alpha Funds would be safe even in the event of a market crash. Indeed, the slide decks provided to Plaintiff by Defendants for the Alpha 1000 Fund and the Alpha 350 Fund touted the risk market overlay strategy of the Alpha Funds and maintained that adequate risk protections were in place at all times to protect against substantial losses—even in unstable or volatile market conditions.

35.     Plaintiff Texas Trust made an initial investment of $40 million in the Alpha 1000 Fund on July 29, 2014. After Plaintiff's initial $40 million investment in the Alpha 1000 Fund, Plaintiff made three subsequent investments of $10 million each on January 29, 2015, April 23, 2015, and August 25, 2015, respectively. Then, on February 26, 2018, Plaintiff made their initial and only investment of $30 million in the Alpha 350 Fund.

36.     After the Plaintiff's investments were made, the Alpha funds experienced multiple market challenges, including the VIX repeatedly peaking in February 2018, reaching a high of 50.3. During the investment period, Plaintiff requested updates from Defendants concerning the operation of the risk management overlay. Defendants assured Plaintiff that protective measures were in place and provided explanations and documents on how the risk management overlay would continue to mitigate downside risks.

II.    **AllianzGI was Obligated to Manage Plaintiff's Alpha Funds Investments to Protect in the Event of Market Decline.**

37.    The rights and obligations governing the Texas Trust's investments with AllianzGI are stated in several contracts and documents referred to and incorporated therein, including, for each Fund: an LLC Agreement, a confidential Private Placement Memorandum ("PPM'), a Subscription Agreement, and a Side Letter.

38.    Pursuant to these agreements, AllianzGI, as the investment manager for the Alpha Funds, was a fiduciary to the Texas Trust in managing their investments in the Alpha Funds. Specifically, § 2.12 of the operative LLC Agreement stated that, "in its capacity as investment manager of the Company, [AllianzGI] acknowledges that it will be a fiduciary with respect to such assets."

39.    AllianzGI is also the Managing Member of the Alpha Funds and was responsible for the general and active management of the Alpha Funds. Section 2.02(r) of the operative LLC Agreement stated that the Managing Member must undertake "all acts for the preservation, protection, improvement, and enhancement in value of all assets."

40.    AllianzGI purported to operate the Structured Alpha Funds with a specific investment objective: to outperform each Alpha Fund's respective benchmark index by a certain number of basis points, or one hundredth of one percent. The Alpha 1000 Fund's investment objective (in which Texas Trust invested $70 million) was to outperform the 90 Day T-Bills' benchmark index by 10%, net fees and expenses.

41.    The investment objective of the Structured Alpha US Equity 350, in which the Texas Trust invested $30 Million, was to outperform the MSCI ACWI Investable

Market Index ("IMI") by approximately 4 to 6% gross fees and expenses. Reducing the net return to investors by the incentive allocation and expenses for Alpha 350, Allianz GI expected to outperform the IMI by approximately 3.5%.

42.    AllianzGI's head portfolio manager, Greg Tournant, described AllianzGI's options strategy as akin to selling insurance, where a premium is paid for the rights provided by the option and a premium is collected to provide that right. While the strategy would earn a net premium from selling both put and call options, the portfolio was stated to always hold more long put option contracts relative to the number of put options sold. By doing so, AllianzGI purportedly protected against downside exposure in a tail risk event or significant market decline, as AllianzGI would be able to exercise or sell those positions in a declining price environment.

43.    Option values are directly affected by the expected volatility of the underlying asset. The values of both put and call options increase as the expected volatility of the underlying asset increases. Thus, the price of the "insurance" that AllianzGI was selling to the markets through its options trading would increase as expected market volatility increased. When expected market volatility went up, the Alpha Funds would make money on its long positions in S&P 500 options and lose money on its short positions. Thus, when volatility was high, AllianzGI could potentially make more money by selling options, while the cost of the options it purchased to hedge its exposure would be higher.

44. In addition to implementing various derivative trades in order to achieve the excess returns over relevant indices, AllianzGI purportedly maintained a constant hedge against large equity sell-offs by holding long, out-of-the money puts, which AllianzGI claimed would protect against any sudden market declines. These trades were critical to the Alpha Funds' risk management strategy and were specifically designed to protect against severe downward market moves, not to generate returns. The point of these trades was to be long volatility in the event of a significant and rapid sell-off in US equity markets.

45. AllianzGI purported to monitor and minimize risk in a variety of ways, including, according to its literature, the following:

- **Structural long-put protection.** "Buy put options—in a greater quantity than sold—to protect the portfolio in the event of a market crash/closure. The puts are laddered for various market outcomes to the downside" and "are designed for tail risk protection, not for outperformance potential, but are a key feature of the strategy's risk management."

- **Real-time monitoring.** "Independent risk-oversight professionals monitor trade activity and risk profiles daily."

- **Rigorous scenario testing.** "Real-time risk monitoring, as well as analysis of statistically significant equity-market scenarios."

46. In fact, Tournant spoke at length in a May 2016 interview, featured on AllianzGI's website, about the risk-mitigating features purportedly inherent in AllianzGI's investment strategies for the Structured Alpha Funds. When asked about the risk-management strategy for the Structured Alpha Funds, Tournant said:

> The way we construct the strategy is we have a wide range of positions. Some positions are designed to make money if the market goes up, some will make money if the market goes down, and some will make money [if the market] is in range-bound. They exist in the portfolio all the time, so therefore our objective is never to guess the direction of the market, not be dependent on the direction of the market, and hopefully we have a statistical outcome that will allow us to generate profits regardless of market directions.

47.     Analogizing the Alpha Funds' strategies to the functioning of an insurance company that would pay when there is a "catastrophic event," Tournant continued, "I would also add the fact that given the positions that we buy to protect ourselves against those catastrophic shocks, those kinds of risk insurance positions, that you could label those as reinsurance." That is, even if a large market downturn were to occur, Tournant explained that the Alpha Funds had "risk insurance positions" that would "further protect [the] portfolio and business."

48.     Tournant reiterated the portfolio's "market-neutral" strategy in an October 2015 video presentation, telling investors that the Alpha Funds were able to generate "consistent returns over the past ten years" and performed well "regardless of market conditions," as the positions were designed to generate returns whether the market was "up, flat or down." For example, Tournant explained that prudent, active management of the portfolio enabled the Alpha Funds to "weather the recent storm" following a substantial "increase in market volatility" in October 2015 by being "able to manage actively our profit zone."

49.    Defendants purported to regularly evaluate the Alpha Funds' portfolio and counterparty risk, business risk, operational risk, and reputational risk. The Alpha Funds claimed to deploy an independent Allianz SE enterprise risk management function, which was apparently responsible for overseeing independent portfolio risk, monitoring daily trade activity, and analyzing weekly risk profiles. AllianzGI also engaged an external, independent Allianz SE risk management service provider to provide analysis and reporting services, with additional "VaR related risk analytics."

50.    The involvement of the related Allianz entities and their experienced and coordinated risk management apparatus was crucial to the Alpha Funds' investment proposition. For example, in assessing another fund run by the same Structured Alpha team that was responsible for the Alpha Funds, Morningstar analysts cited the benefits of the "broader resources at Allianz Global Investors," including the "firm's independent risk management function [which] oversees the structured alpha platform, monitoring daily trading activity." According to Morningstar, the "team's disciplined focus on risk management—through limits on leverage, perennial crash protection through put option hedges, position diversity across expirations, and the managers' ability to adjust the risk profile during volatile markets—gives us confidence this strategy can continue to overcome such short-term setbacks," including those that can accompany unexpected volatility spikes. Critical to that risk management analysis was Morningstar's observation that the Structured Alpha team not only "performs a daily quantitative risk analysis,

which includes a variety of stress tests," but also "benefits from Allianz Global Investors'

independent risk oversight with real-time positioning monitoring."

### III. AllianzGI Ignores Investment Mandate to Protect Texas Trust's Assets in Downturn in favor of Self-Interested Fee Structure.

51.     If AllianzGI had managed the Alpha Funds in accordance with the required

risk management and investment strategy, then the Texas Trust's tremendous losses

would have been avoided. Not only did AllianzGI fail to properly hedge for an ongoing

market downturn in late February 2020, but AllianzGI abandoned its investment

mandate in 2020 and positioned the Alpha Funds' portfolios in a manner that exacerbated

their losses.

52.     The coronavirus began to be widely covered by major U.S. news outlets as

early as January 8, 2020. On January 21, 2020, equity prices worldwide dropped due to

fears that the coronavirus outbreak could slow global economic growth. On February 3,

2020, Mohamed El-Erian, chief economist for Allianz SE, appeared on CNBC to comment

on the impact of the spread of coronavirus. El-Erian said, "The coronavirus is different…

it is big. It's going to paralyze China. It's going to cascade throughout the global economy.

And, importantly, it cannot be countered . . . by central bank policies. So, I think we

should pay more attention to this, and we should try and resist our inclination to buy the

dip." He also advised: "But ask yourself the regret minimization. If I end up making a

mistake, which again, I don't want to make, but if I end up making a mistake, which

mistake will I regret less?" "I have found having managed other people's money, which

is a massive responsibility, through very, very turbulent markets in emerging markets

that these two simple guidelines, if you like, can help navigate and simplify what is an enormous complexity."

53.     Indeed, the VIX Index, which measures the market's expectations of volatility based on the S&P 500—and which increases in a market downturn—was at a high of 40 at the end of February 2020 and leading into March 2020.

54.     As volatility in the market increased throughout February and March 2020, AllianzGI made a series of investments positioning the Funds' portfolio to generate returns **if volatility subsided**. Specifically, as the market began to slide in February 2020, and the Alpha Funds began incurring losses, AllianzGI structured the Alpha Funds' portfolios to recoup those losses, taking aggressive positions that deviated from the investment strategy and abandoning the risk controls Allianz was required to have in place.

55.     By the end of February 2020, AllianzGI positioned the portfolio to generate returns if the market stabilized and volatility levels declined, gambling that the Alpha Funds would reap substantial returns by selling an immense amount of high-premium insurance that would never result in any claims from the investors who bought coverage. This positioning was totally contrary to the requirement that the Funds "Buy put options—in a greater quantity than sold—to protect in the event of a market crash/closure."

56.     In response to significant losses in February 2020, which increased the likelihood of redemptions from investors, the Alpha 1000 Fund effectively abandoned its

tail risk protection strategy and positioned the fund to produce outsized returns in the event that markets became less volatile. However, that restructuring effort actually resulted in the fund becoming even more exposed to further increases in volatility and, contrary to the investment's mandate, strategy, and historical approach, exposed investors to greater risk, ultimately resulting in even greater monetary losses.

57.     The Alpha 350 Fund, managed by the same head portfolio managers and investment team as the Alpha 1000 Fund, suffered extraordinary losses based on the same mismanagement. Specifically, the Funds' deviation from the purported fund strategy and lack of basic risk management. Indeed, Allianz Global Investors' public marketing materials present one "Allianz Structured Alpha" strategy that it applies to its multiple Structured Alpha investment funds.

58.     The Alpha Funds' positioning in volatility options was also anything but market neutral. It was positioned to decline in value if there was an increase in volatility. Rather than have positions that would protect the investors in the Alpha Funds in the event of a further market downturn, the Alpha Funds were not positioned to protect capital in a severe downturn. The Alpha Funds did not have a diversified option strategy with proper risk modeling, but instead, AllianzGI took large, extremely risky positions that assumed equity prices would rise or normalize and volatility would fall.

59.     In breach of its duties of loyalty and care, AllianzGI took the massive risk of "doubling down" on its prior failed strategy in March 2020, without regard for the potential to increase Plaintiff's losses. AllianzGI needed to reverse the Alpha Funds'

existing losses by March 31, 2020 or it would be unable to collect performance-based management fees from the Texas Trust (and the other investors in the Structured Alpha Funds) for the foreseeable future.

60.    The market downturn in February and March 2020 was hardly unprecedented and resembled a pattern that has been repeated numerous times in numerous contexts. For example, on October 19, 1987, commonly known as "Black Monday," the Dow declined over 22%, the largest single-day decline in history.

61.    In comparison, on March 16, 2020, the date of the biggest one-day drop of the coronavirus-related downturn, the Dow fell just under 13%. Over the span of several weeks, from mid-February through March 2020, the Dow lost about 35% of its value. Indeed, a March 31, 2020 research note by AllianzGI acknowledged, "Even though US equity markets have fallen around 25% this year, previous down-turns were worse: markets fell about 50% from peak to trough in 2001 and 2008".

62.    Periods of sudden spikes in volatility are somewhat common and occur at least once a decade. VIX repeatedly peaked during the period of August 2011 to October 2018, including reaching a high of 50.3 in February 2018 compared to an average of 10.8 for the 30 prior trading days. On February 5, 2018, a day that would come to be known as "Volmageddon," the VIX jumped by a record 20 points. AllianzGI specifically drew a comparison to that "volatility surge" in its fourth-quarter 2019 commentary for the Structured Alpha Funds, stating, "Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move" as "refinements

we have implemented since then as part of our ongoing R&D process have made the option portfolio more resilient."

63.     Despite the ample historical precedent for a market drawdown and volatility surges similar to what occurred in February and March 2020, and contrary to its purported "proprietary" risk management acumen, AllianzGI's management of the Structured Alpha Funds' portfolios increased the likelihood of catastrophic losses. As an investment manager charged with being prepared for market downturns and to have "reinsurance" against catastrophic shocks, AllianzGI was required to have proper hedging positions in place to protect its clients' investments in the event of a sudden downturn. AllianzGI also should have maintained proper risk management protocol and stress testing to ensure that it remained disciplined with its downside protections.

64.     Against the backdrop of the broad market decline, the returns on AllianzGI's Alpha Funds for the first quarter of 2020 severely underperformed their benchmark indices. The March 2020 returns were -52.18% for Alpha 350 compared to -14.4% for the ACWI IMI index and -96.5% for the Alpha 1000 Fund compared to +0.29% for the 90-day Treasury Bill.

65.     In breach of its duties of loyalty and care, AllianzGI took the massive risk of "doubling down" on its prior failed strategy in March 2020 without regard for the potential to increase Plaintiff's losses. AllianzGI needed to reverse the Alpha Funds' existing losses by March 31, 2020 or it would be unable to collect performance-based

management fees from Plaintiff and the other investors in the Structured Alpha Funds for the foreseeable future.

66.     AllianzGI has admitted that in early March 2020, it embarked on this new approach, which it has referred to, ironically, as "de-risking." In this case, "de-risking" apparently meant: (a) buying back short positions in a falling market (at significant cost); (b) further shorting volatility; and (c) failing to hedge the Funds' portfolios to protect against further losses. This "de-risking" move was a total abandonment of the investment strategy, hedging and risk management practices that AllianzGI had promised Plaintiff.

67.     The dramatic losses that the Allianz Funds suffered throughout the market downturn were at odds with the structural risk protections that AllianzGI was required to have in place. Moreover, adequate stress testing for dramatic market movements, which the AllianzGI management team and Allianz Global Investors were required to perform regularly for the Structured Alpha Funds, should have highlighted the risks of a severe, multi-week decline and sudden uptick in volatility that occurred in February and March 2020.

## IV.    Plaintiff Suffered Substantial Losses as a Result of Allianz's Mismanagement and Breaches of Fiduciary Duties.

68.     On January 31, 2020, the Texas Trust had $34,712,083 in assets in the Alpha 350 Fund and $107,395,152 in assets in the Alpha 1000 Fund. By the end of April, the Texas Trust's assets in the Alpha 350 Fund fell to $15,414,527.21 while the assets in the Alpha 1000 Fund fell to a mere $2,958,677.18.

69.     On March 25, 2020, AllianzGI hosted an investor webinar to announce it was liquidating the Alpha 1000 Fund. AllianzGI stated that liquidation was required because its investment strategy "was designed to address short-term volatility in the market and not the long-term uncertainty currently being faced." AllianzGI refused to respond to investor questions regarding: (i) how this could have occurred if the Alpha Funds were positioned per strategy outlines; (ii) what AllianzGI would do for affected investors; or (iii) how they would support Alpha Fund investors through the liquidation process.

70.     On April 6, 2020, in an email to Allianz Investor Services, the Texas Trust submitted an executed notice of redemption request to AllianzGI for the total remainder of its investment in the Alpha 350 Fund.

71.     On April 7, 2020, Morningstar Analysts highlighted AllianzGI's negligence in a report titled "A failure in risk management," downgraded the Alpha Funds to "Negative" across all share classes and recommended that investors avoid the Alpha Funds. As Morningstar noted, AllianzGI's attempts to restructure the Structured Alpha Funds "exposed a serious weakness in the strategy" and risk management failures and imprudent restructuring efforts actually "locked in the strategy's . . . losses."

72.     As a result of Defendants' negligence and breaches of fiduciary duty and contract, Defendants caused the Texas Trust to suffer losses reasonably believed to be in excess of $123,000,000.

## COUNT I: NEGLIGENCE

73.    The Texas Trust incorporates by reference the allegations contained in paragraphs 1-72, as though fully stated herein.

74.    As Managing Member of the Alpha Funds, AllianzGI owed a duty of care to Plaintiff based on the special relationship, or "privity," arising out of the LLC Agreements, Subscription Agreements, PPM's, Side Letter Agreements, and documents incorporated and/or referred to in such agreements between AllianzGI and Plaintiff regarding each of the Alpha Funds.

75.    In addition, the PPM for the Alpha Funds provided that AllianzGI was "responsible for the general management of the investment portfolios of the Fund[s] under the Operating Agreement[s]."

76.    AllianzGI breached its duty to the Texas Trust by failing to exercise reasonable care in properly protecting the Alpha Funds against a severe market downturn. Specifically, AllianzGI failed to conduct adequate stress tests to assess the ability to trade the Alpha Funds' portfolios during times of low market liquidity or otherwise disregarded the results of the tests it conducted.

77.    In addition, AllianzGI abandoned its tail risk protection strategy, which was supposed to be in place to provide structural risk protections to the Structured Alpha Funds in the event of any market environment.

78.    AllianzGI further was negligent in taking these actions during the downturn, including when restructuring the Structured Alpha Funds portfolio and

strategies, thereby locking in, and exacerbating the negative returns.

79.     AllianzGI's mismanagement of the Structured Alpha Funds runs contrary to AllianzGI's duty to build "structural risk protection" into its portfolios, as AllianzGI—as the Managing Member of the Alpha Funds—was obligated to do on behalf of its investors.

80.     Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager and engaging in such conduct as would have been reasonably expected.

81.     By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI, as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

82.     Defendants also each acted in a joint enterprise (by and among each other), including by holding out the management of the Alpha Funds through the operation of "Allianz Global Investors." In so doing, Defendants acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

83.     As a direct and proximate result of the actions and omissions by Defendants, as set forth above, the Texas Trust has sustained actual damages in an amount to be proven at trial.

## COUNT II: BREACH OF FIDUCIARY DUTY

84.    The Texas Trust incorporates by reference the allegations contained in paragraphs 1-72, as though fully stated herein.

85.    In its capacity as Managing Member of the Funds, AllianzGI owes all investor-members, including Plaintiff, fiduciary duties, including the duty of care. Alliance GI was therefore required to act with the requisite level of care of a skilled investment manager to protect Plaintiff's assets against a downside risk.

86.    AllianzGI breached its fiduciary duty of care by failing to protect the Texas Trust's assets against the downside risk of market collapse as it has previously represented.

87.     Indeed, for years, AllianzGI promised investors that a "cornerstone of the strategy's investment processes" included "multiple layers of risk control" and "structural risk protections" to "protect the portfolio in the event of a market crash."

88.    These risk protection measures were to be "in place at all times, exclusively for risk management purposes." Yet, in mid-March 2020, AllianzGI failed to abide by the risk management strategies promised, and which it previously adhered to during times of market unrest.

89.    Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was

undertaken while carrying out its routine function as a portfolio manager and engaged in such conduct as would have been reasonably expected.

90.     By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI, as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

91.     Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Alpha Funds through the operation of "Allianz Global Investors." In so doing, Defendants acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE. As a direct and proximate result of the actions and omissions by Defendants, as set forth above, the Texas Trust has sustained actual damages in an amount reasonably believed to be in excess of $123,000,000.

## COUNT III: BREACH OF CONTRACT

92.     The Texas Trust incorporates by reference the allegations contained in paragraphs 1-72, as though fully stated herein.

93.     The LLC Agreement, PPM, Subscription Agreement, Side Letter, and associated documents create a valid and enforceable contract.

94.     Pursuant to that contract, AllianzGI was expressly and impliedly required to manage the Funds in accordance with its stated risk management process. In the contract, AllianzGI represents that it will "do all acts for the preservation, protection,

improvement, and enhancement in value of all assets." AllianzGI's policies required that it make certain that option positions were always in place to create a floor to protect LLC assets from significant market declines. Failing to implement risk management procedures to protect and preserve the Alpha Funds' assets would be a breach of that obligation.

95.     AllianzGI breached its contractual obligations by failing to abide by the risk management strategies promised—and previously adhered to in times of market unrest.

96.     However, AllianzGI did not weather the market conditions in this situation appropriately, as AllianzGI failed to seal its downside position.

97.     Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager and engaging in such conduct as would have been reasonably expected.

98.     By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI, as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

99.     Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Alpha Funds through the operation of

"Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

100.    As a direct and proximate result of the actions and omissions by Defendants, as set forth above, Plaintiff has sustained actual damages in an amount reasonably believed to be in excess of $123,734,000 as the Alpha Funds' assets were reduced by as much as 97 percent.

## PRAYER FOR RELIEF

WHEREFORE, the Texas Trust respectfully requests this Court:

(a)    Award the Texas Trust compensatory damages in an amount to be proven at trial;

(b)    Award the Texas Trust disgorgement of fees that Defendants have collected; and

(c)    Grant the Texas Trust any further and additional relief the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: July 15, 2021                          KAPLAN FOX & KILSHEIMER LLP

                                              /s/ Frederic S. Fox
                                              Frederic S. Fox
                                              Donald R. Hall
                                              Aaron L. Schwartz
                                              850 Third Avenue, 14th Floor
                                              New York, NY 10022
                                              Tel.: (212) 687-1980
                                              Fax: (212) 687-7715

31

ffox@kaplanfox.com
dhall@kaplanfox.com
aschwartz@kaplanfox.com

*Counsel for Plaintiff Texas Treasury Safekeeping Trust Company*